# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

### PHILLIP JERGENSON,

*Plaintiff-Appellee*

v.

### INHALE INTERNATIONAL LIMITED,

*Defendant-Appellant*

**On Appeal From**
United States District Court For The Northern District Of Illinois
Eastern Division
D.C. No. 1:22-CV-02040
Honorable Judge Manish S. Shah, Presiding

## APPELLANT'S OPENING BRIEF

Louis F. Teran
SLC Law Group
1055 E. Colorado Blvd., Suite #500
Pasadena, CA 91106
(818) 484-3217 x200

*Counsel for Defendant/Appellant*

## DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons and entities as described in Circuit Rule 26.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Appellant**
Inhale International Limited

**Counsel for Appellant**
Louis F. Teran
SLC LAW GROUP
1055 E. Colorado Blvd., Suite 500
Pasadena, CA 91106
Telephone: (818) 484-3217 x200
Facsimile: (866) 665-8877
Email: LTERAN@SLCLG.com

**Appellee**
Phillip Jergenson

**Counsel for Appellee**
Joseph E. Tighe
REYES KURSON, LTD
328 South Jefferson Street, Suite 909
Chicago, IL 60661
Telephone: (312) 332-0055
Facsimile: (312) 332-0419
Email: jtighe@rkchicago.com

James E. Judge
Zareefa B. Flener
FLENER IP LAW, LLC
77 W. Washington St., Suite 800
Chicago, IL 60602
Telephone: (312) 724-8874
Email: jjudge@fleneriplaw.com


Louis F. Teran
Attorney of Record for Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument.  This appeal will require the Court to interpret the laws and evaluate facts regarding a district court's discretion related to award of fees.  Oral argument may assist the Court in resolving these issues.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .................................................................. 7

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................ 8

STATEMENT OF THE CASE .................................................................... 9

SUMMARY OF THE ARGUMENT ............................................................ 10

THE STANDARD OF REVIEW IS ABUSE OF DISCRETION .................... 12

ARGUMENT ............................................................................................ 12

  I.    THE DISTRICT COURT ABUSED ITS DISCRETION REGARDING AWARD OF ATTORNEYS' FEES .................................................................. 12

  II.   JERGENSON'S LITIGATING POSITION WAS EXCEPTIONALLY WEAK . 16

     A. Jergenson Did Not Have Evidentiary Support For His Claim That Inhale Used The Trademark ................................................................................ 16

     B. Jergenson Did Not Own The Trademark ........................................... 20

       1) *Jergenson Abandoned the Trademark in 1987* ............................... 20

       2) *Jergenson Did Not Regain Rights to the Trademark After 1987* .... 21

  III.  JERGENSON COMMITTED  FRAUD ON THE USPTO .................................. 26

  IV.  THE DISTRICT COURT WAS UNREASONABLE IN RELYING ON THE PRESUMPTION AFFORDED BY THE REGISTRATION ............................... 31

  V.   THE DISTRICT COURT WAS UNREASONABLE IN HOLDING THAT JERGENSON WAS NOT AWARE OF HOW SMALL DAMAGES WERE UNTIL AFTER DISCOVERY ........................................................... 34

  VI.  THE TRAVESTY IN THIS CASE IS THAT 240 OTHER DEFENDANTS HAVE A JUDGMENT ENTERED AGAINST THEM OR HAVE SUCCUMB TO JERGENSON'S UNREASONABLE SETTLEMENT DEMANDS .................... 37

CONCLUSION ........................................................................................ 38

# TABLE OF AUTHORITIES

## CASES

Brown v. Pacifica Foundation, Inc.
  34 Cal. App. 5th 915 (1st Dist. 2019) ........................................................ 34

California Packing Corp. v. Sun-Maid Raisin Growers of California
  81 F.2d 674 (9th Cir. 1936) ........................................................... 22, 28, 31

Consumers Petrolium Co. v. Consumer's Co. of Illinois
  169 F.2d 153 (7th Cir. 1948) ......................................................... 22, 28, 31

Cooter & Gell v. Hartmarx Corp.
  496 U.S. 384 (1990) ........................................................................... 12

Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.
  841 F.Supp. 1339 (E.D.N.Y. 1994) .................................................... 24, 29

Donnell v. Herring-Hall-Marvin Safe Company
  208 U.S. 267 (1908) ....................................................................... 22, 28, 31

Federal Trade Commission v. Simple Health Plans LLC
  379 F. Supp. 3d 1346 (S.D. Fla. 2019) ..................................................... 34

Herring-Hall-Marvin Safe Co. v. Hall's Safe Co.
  208 U.S. 554 (1908) ....................................................................... 22, 28, 31

Highmark Inc. v. Allcare Health Management System, Inc., 572 U.S. 559
  (2014) ........................................................................................ 11, 12

Hodes & Nauser, MDs, P.A. v. Schmidt
  309 Kan. 610 (2019) ........................................................................... 34

Keller v. Kay
  96 N.Y.S.3d 605 (2d Dep't 2019) ......................................................... 34

Louisiana-Pacific Corporation v. James Hardie Building Products, Inc.
  928 F.3d 514 (6th Cir. 2019) ................................................................ 34

Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.
  627 F.2d 628 (2d. Cir. 1980) .............................................................. 24, 29

Octane Fitness, LLC v. ICON Health & Fitness, Inc.
  572 U.S. 545 (2014) ........................................................................... 12

Premier Dental Prods. Co. v. Darby Dental Supply Co.
  794 F.2d 850 (3d Cir. 1986) ................................................................. 28

Scaltech, Inc. v. Retec/Tetra, LLC
  269 F.3d 1321 (Fed. Cir. 2001) ............................................................. 16

Tie Tech, Inc. v. Kinedyne Corp.
   296 F.3d 778 (9th Cir. 2002) ............................................................... 30

Vuitton et Fils S.A. v. J. Young Enters., Inc.
   644 F.2d 769 (9th Cir. 1981) ............................................................... 30

Wechem, Inc. v. Evans
   274 So. 3d 877 (La. Ct. App. 5th Cir. 2019) ......................................... 34

## STATUTES

15 U.S.C. §1051(a) ................................................................................. 25

15 U.S.C. §1051(b) ................................................................................. 25

15 U.S.C. §1117(a) ........................................................................ 6, 8, 10

15 U.S.C. §1127 ....................................................................... 19, 22, 24

37 CFR §2.33 .................................................................... 24, 25, 27, 28

## OTHER AUTHORITIES

Restatement (Second) of Contracts §26 (1981) ....................................... 16

## JURISDICTIONAL STATEMENT

Appellant/Defendant Inhale International Limited ("Inhale") appeals from the Order denying its Motion for Attorneys' Fees. The Order was entered in this action on December 27, 2023. *[ECF No 93]*. The Order was entered by the Honorable Judge Manish S. Shah in the United States District Court for the Northern District of Illinois. Inhale timely filed a Notice of Appeal on January 17, 2024. *[ECF No 94]*. This Court has jurisdiction over the appeal under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Did the District Court abuse its discretion by finding that this trademark

infringement action was not exceptional pursuant to 15 U.S.C. §1117(a)?

## STATEMENT OF THE CASE

This case was filed in April 2022, by Appellee/Plaintiff Philip Jergenson ("Jergenson") against Appellant/Defendant Inhale International Limited ("Inhale") and 240 other defendants. *[ECF No 1]*. This case arises from claims that Inhale and 240 other defendants infringed Jergenson's rights under the Lanham Act to the "PROTO PIPE" mark ("Trademark"). *[ECF No 1]*. In 2019, the United States Patent and Trademark Office ("USPTO") issued to Jergenson U.S. Trademark Registration No. 5,721,420 for the Trademark ("Registration"). *[ECF No 89-1 at 5]*. Immediately upon filing this case, the District Court issued a Temporary Restraining Order ("TRO") that required, in part, third parties to produce relevant documents to Jergenson in an expedited basis. *[ECF No 16]*. Out of the 241 defendants, Inhale was the only one that litigated this matter while the other 240 defendants either defaulted or reached a settlement with Jergenson.

Despite receiving expedited discovery pursuant to the TRO, Jergenson conducted extensive discovery on Inhale. Then, after months of extensive discovery, Jergenson voluntarily dismissed its claim against Inhale because the expense of one deposition "alone outweigh[ed] any monetary remedy [Jergenson] could expect to receive should he prevail in this case." *[ECF No 83 at 2]*. Thus, the District Court entered final judgment dismissing all claims against Inhale with prejudice on April 7, 2023. *[ECF No 88]*. In addition, the District Court held

Inhale to be the prevailing party.  *[ECF No 87]*.

Thereafter, Inhale filed a motion for attorneys' fees pursuant to 15 U.S.C.

§1117(a).  *[ECF No 89]*.  The District Court denied Inhale's motion holding that

this case was not exceptional.  *[ECF No 93]*.  Thus, Inhale hereby appeals the

District Court's denial of said motion.

## SUMMARY OF THE ARGUMENT

With this appeal, Inhale asserts that the District Court abused its discretion

by holding that this trademark infringement case was not exceptional pursuant to

15 U.S.C. §1117(a).  Jergenson filed this action asserting a trademark infringement

claim that was exceptionally weak.  In 2018, Jergenson filed a trademark

application with the USPTO with his verified statement that he used the Trademark

in commerce since 1976.  *[ECF No 89-1 at 5]*.  After the USPTO issued Jergenson

the Registration, he filed this action against Inhale and 240 other defendants.

*[ECF No 1]*.

However, Jergenson's claim was exceptionally weak because he had sold his

rights to the Trademark to a third party in 1987 and had not used the Trademark in

commerce since then until 2019 when the USPTO issued the Registration.

Essentially, Jergenson surrendered his rights to the Trademark in 1987 and had not

used the Trademark since then for a period of over 30 years.  Nevertheless,

Jergenson attained the Registration after he falsely represented to the USPTO that

he had used the Trademark since 1976, that he was still using the Trademark in commerce, and that nobody else had any rights to use the Trademark in commerce. Despite undisputable evidence that Jergenson was not the owner of the Trademark, the District Court unreasonably relied on the presumption of validity afforded by the Registration to hold that Jergenson had a good faith belief that he was the owner of the Trademark.

Even more, Jergenson's trademark infringement claim against Inhale was entirely based on one listing published on the internet which Jergenson erroneously alleged to be an offer for sale in connection with the Trademark in violation of the Lanham Act. However, said internet listing does not constitute use of the Trademark pursuant to the Lanham Act because it is not a sale or an offer for sale. Instead, the District Court acknowledged that the listing is just an invitation to make an offer. But then the District Court unreasonably held that despite the lack of evidence that Inhale used the trademark, Inhale had not presented evidence that Jergenson did not have a good faith belief that Inhale was selling or offering to sell a product in connection with the Trademark.

Finally, this case started with the District Court issuing a TRO that ordered third parties to provide Jergenson documents related to Inhale's sales and finances related to the Trademark. *[ECF No 16].* After attaining such records pursuant to the TRO, Jergenson dragged Inhale through months of extensive discovery only to

then voluntarily dismiss its claim because the damages was minuscule. Then the

District Court unreasonably held that Jergenson had to pursue discovery against

Inhale because there is no evidence that Jergenson was aware that his damages

would be so low at the time of filing this litigation and in pursuing discovery.

With its holding, the District Court unreasonably ignored the fact that it had issued

a TRO very early in the case, before the start of discovery, that allowed Jergenson

access to records of Inhale's sales and other financial information.

As such, Inhale hereby appeals the District Court's holding that this case

was not exceptional. More specifically, Inhale asserts that the District Court's

holding was unreasonable based on the facts and law.

## THE STANDARD OF REVIEW IS ABUSE OF DISCRETION

The Lanham Act provides that "[t]he court in exceptional cases may award

reasonable attorney fees to the prevailing party." See *15 U.S.C. §1117(a).* The

determination of whether a case is exceptional for fee-shifting purposes is to be

reviewed by appellate court only for abuse of discretion. See *Highmark Inc. v.

Allcare Health Management System, Inc.,* 572 U.S. 559, 563 (2014).

## ARGUMENT

## I.   THE DISTRICT COURT ABUSED ITS DISCRETION REGARDING AWARD OF ATTORNEYS' FEES

Whether a case is exceptional pursuant to 15 U.S.C. §1117(a) rests on one of

two factors: (1) the substantive strength of a party's litigating position; or (2)

unreasonable manner in which the case was litigated.  See *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 554 (2014).

It is established that determination of whether a case is exceptional for fee-shifting purposes is to be reviewed by appellate court only for abuse of discretion.  See *Highmark Inc. v. Allcare Health Management System, Inc.,* 572 U.S. 559, 563 (2014).  However, the abuse of discretion standard does not preclude an appellate court's correction of a district court's legal or factual error:  "A district court would abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."  See *Id.* at n.2 (quoting *Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 405 (1990).

In the present case, the District Court correctly held that Inhale is the prevailing party.  *[ECF No 87].*  However, despite acknowledging the lack of evidence that Inhale actually sold or offered to sell a product in connection with the Trademark, the District Court unreasonably held that Jergenson's claim was not exceptional because Inhale did not show that "Jergenson did not have a good faith belief that Inhale was offering for sale and selling" the accused product at the time he brought the case.  *[ECF No 93 at 3].*  However, showing that Jergenson's claim did not have any factual support should be enough to show by the preponderance of the evidence that Jergenson's claim was weak and stood out from other trademark infringement cases where defendant's use of a mark is

supported by evidence and the primary question in dispute is likelihood of
confusion caused by such use.

Second, the District Court correctly held that Jergenson abandoned the
Trademark in 1987 when he sold it to a third party. *[ECF No 93 at 3].* But then
the District Court erroneously implies that rights to the Trademark reverted back to
Jergenson when the third party who purchased it in 1987 stopped using it. *[ECF
No 93 at 3-4].* Such is an erroneous view of the law that must be corrected by this
Court.

Third, in 2018, after not having used the Trademark for over 30 years since
1987, Jergenson filed a trademark application with the USPTO falsely representing
that he had used the mark since 1976. *[ECF No 89-1 at 5].* However, Jergenson
had not used the mark for over 30 years and, as a matter of law, Jergenson's sale of
the Trademark in 1987 precludes him from asserting a priority of use predating the
sale. Jergenson also falsely represented to the USPTO that he was continuing to
use the mark at the time he filed his application. Furthermore, Jergenson falsely
represented to the USPTO that he was unaware of anybody else having rights to
use the Trademark when, in fact, he knew that he had sold his rights to a third
party.

Despite the undisputable evidence that Jergenson made false representations
to the USPTO to attain the Registration, the District Court held that Inhale failed to

show that Jergenson made such false representations "knowingly" to establish fraud. *[ECF No 93 at 4]*. But, the District Court's assessment of the evidence is clearly erroneous because Jergenson's false statements to the USPTO were **verified** as required by law. Nevertheless, the evidence presented are enough to rebut any presumption afforded by the Registration and to show that Jergenson's claim was exceptionally weak and stood out from other trademark infringement cases where plaintiff's ownership of a mark is supported by evidence and the primary question in dispute is likelihood of confusion caused by defendant's use.

Finally, the District Court held that it was proper for Jergenson to have dragged Inhale through months of extensive discovery only to then dismiss his claims based on his purported realization that the damages were minuscule. *[ECF No 93 at 6]*. However, in making such finding, the District Court ignored the fact that it had issued a TRO at the very start of the case before discovery started that allowed Jergenson access to records related to Inhale's sales and use of the Trademark. Despite having such records showing that damages were minuscule, Jergenson unreasonably dragged Inhale through months of extensive discovery only to then dismiss the case based on minuscule damages. Such makes this case exceptional, as discussed in detail below.

## II.    JERGENSON'S LITIGATING POSITION WAS EXCEPTIONALLY WEAK

### A.    Jergenson Did Not Have Evidentiary Support For His Claim That Inhale Used The Trademark

As discussed in detail below, Jergenson failed to provide any evidence whatsoever that Inhale used the Trademark.  The only evidence on which Jergenson relied is a product listing published on the website located at www.alibaba.com ("the Alibaba Listing").  *[ECF No 89-1 at 7]*.  But the Alibaba Listing is not an offer to sell a product as required by the Lanham Act.  Instead, the Alibaba Listing is merely an invitation to negotiate the terms of a sale.  In fact, the District Court recognized this but erroneously held as follows:

> "While customers may have not been able to purchase Inhale's product through its listing, Inhales (sic) has not provided any evidence that Jergenson did not have a good faith belief that Inhale was offering for sale and selling smoking pipes that infringed on his registered trademark at the time he brought this case."  *[ECF No 93 at 3]*.  .

However, Jergenson acknowledged that his claim against Inhale relied solely on the Alibaba Listing.  *[ECF No 36-4 at 4] and [ECF No 78 at 4]*.  But the Alibaba Listing does not allow for the direct purchase of the product listed.  Instead, it merely allows to "Start Order" for the product, rather than to "Buy" the product.  *[ECF No 89-1 at 7]*.  In fact, Jergenson produced a document evidencing that he unsuccessfully attempted to purchase the accused product directly through the Alibaba Listing as "John Doe".  *[ECF No 89-1 at 9]*.  Jergenson's document

evidences that his purchase order was started but could not be completed until

Inhale, the supplier, was contacted to negotiate terms of the purchase. *[ECF No*

*89-1 at 9]*. After all, there is no "Payment Amount" identified in the purchase

order. *[ECF No 89-1 at 9]*. Instead, the purchase order expressly states, "To be

negotiated." *[ECF No 89-1 at 9]*. Such is consistent with the rules and procedures

of the website located at www.ailibaba.com ("Alibaba"). More specifically,

Alibaba is not a website where products can be purchased directly as in a typical e-

commerce website. Instead, Alibaba is primarily a directory of manufacturers.

Alibaba provides information of various manufacturers and then facilitates a

transaction for a fee only after the seller and buyer have negotiated the terms. This

is expressly described by Alibaba as follows:

> "To buy on Alibaba.com, you may follow the steps:
>
> > Step 1. Find products and sellers
> > Step 2. Connect with sellers and negotiate with them on product/order
> > details (such as product price, shipping method, shipping cost, etc.)
> > Step 3. Pay on Alibaba.com
> > Step 4. Ship and receive your goods." *[ECF No 89-1 at 11]*.

Therefore, the Alibaba Listing does not constitute a "sale" or an "offer for

sale" as required by the Lanham Act. After all, an offer for sale is "one which the

other party could make into a binding contract by simple acceptance". See

*Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328 (Fed. Cir. 2001). In this

case, at best, the Alibaba Listing can be construed as being an invitation to make

an offer since it omits the quantity to be sold, time and place of delivery, terms of payment, and other terms. See *Restatement (Second) of Contracts* §26 (1981).

Furthermore, Jergenson failed to produce any evidence whatsoever that Inhale authorized or created the Alibaba Listing. After all, Alibaba is primarily a directory of manufacturers. While manufacturers may create or authorize the creation of their listings in Alibaba, listings can also be created by third parties without the knowledge or authorization of a manufacturer. This seems to be the case here because it is established that Inhale is a manufacturer located in Hong Kong. *[ECF No 64]*. However, the Alibaba Listing identifies an address in "Guangdong, China". *[ECF No 89-1 at 8]*. Thus, there is no evidence that Inhale authorized or created the Alibaba Listing.

Even more, any notion that Jergenson had a good faith belief that Inhale was selling products in connection with the Trademark is dispelled by the fact that immediately upon filing this lawsuit, Jergenson attained access to Inhale's sales records from Alibaba. In fact, at the start of this case, the District Court issued a TRO ordering as follows:

> "…any third party…who is providing services for any of the Defendants…such as Alibaba…shall…provide to Plaintiff expedited discovery…sufficient to determine…(a) identities and locations of Defendants…; (b) the nature of Defendant's operations and all associated sales…and financial information; and (c) any financial accounts owned or controlled by Defendants…" *[ECF No. 16, ¶4]*.

Thus, at the start of this case, Jergenson attained records related to Inhale's sales and offers for sale through Alibaba. Despite having such records, Jergenson never provided any evidence whatsoever that Inhale sold or offered to sell a single product in connection with the Trademark. After all, as discussed above, Jergenson's own documents show that he attempted to purchase the accused product directly from Inhale through the Alibaba Listing but failed. Inhale never sold Jergenson anything.

Accordingly, Jergenson failed to produce any evidence whatsoever that Inhale ever sold or offered to sell a product in connection with the Trademark. Even more, Jergenson failed to produce any evidence whatsoever that Inhale ever created or authorized the creation of the Alibaba Listing. More specifically, Jergenson failed to produce any evidence whatsoever that Inhale ever used the Trademark in violation of the Lanham Act or in any way that would infringe Jergenson's rights to the Trademark.

In light of Jergenson's lack of evidence, the District Court acknowledged that Inhale did not offer to sell the accused product through the Alibaba Listing, but then unreasonably concluded that this does not show that "Jergenson did not have a good faith belief that Inhale was offering for sale and selling" the accused product. However, for such a belief to be classified as being in good faith, it must have some factual support. In this case, Jergenson relied exclusively on the

Alibaba Listing (*[ECF No 36-4 at 4] and [ECF No 78 at 4]*) which does not

support the notion that Inhale sold or offered to sell the accused product.

Therefore, at worst, Jergenson's claim against Inhale was entirely baseless and, at

best, it was exceptionally weak.  Such makes this case exceptional.

### B.    <u>Jergenson Did Not Own The Trademark</u>

The District Court held as follows:

> "In deposition, Jergenson acknowledged that he sold all rights to the
> trademark in 1987 without intent to use it again in the future.  After the
> new owner was unable to operate the business and ceased of
> manufacturing and selling the PROTO PIPE branded products, Jergenson
> started to manufacture and sell the PROTO PIPE branded products and
> proceeded with the trademark application under the guidance of his
> trademark counsel.  Jergenson argues that when he filed the lawsuit, he
> owned the PROTO PIPE trademark, which is considered presumptively
> valid as it is registered with the Untied States Patent and Trademark
> Office.  While the parties dispute the validity of Jergenson's trademark,
> that does not make Jergenson's attempt to enforce his trademark rights
> exceptional." *[ECF No 93 at 3-4].*

Thus, there are two issues addressed by the District Court that merit more

discussion, whether Jergenson abandoned the Trademark in 1987 and whether

Jergenson regained any rights to the Trademark after abandonment.

### (1)    *Jergenson Abandoned the Trademark in 1987*

As the District Court held, Jergenson acknowledged that he sold all rights to

the Trademark in 1987 without any intent to use it again in the future.  In fact,

Jergenson testified that he sold the Trademark as follows:

"Q:…  So the sale of the business was in 1987; correct?
A:  Yes.
Q:  All right.  And you received $150,000 for the business?
A:  Over a period of time, yes.
…
Q:  So the trademark that you had for Proto Pipe was part of the sale?
A:  That's correct."  *[ECF No 89-1 at 58-59]*.

Then, in deposition, Jergenson explained his motives for selling his business

and Trademark, as follows:

> "Q:  Why did you sell the business in '87?
> A:  I had another new invention, which I thought was absolutely
> earthshaking.  It is called -- I now call it Gridbeam.  I used to call it Box
> Beam structural system.  I've written two books on it.  And it is a structural
> system that allows anybody to dream up and build whatever they want.  It
> works like a kid's erector set or Legos…  And that's what occupied my
> intention.  And I thought it will dwarf in sales anything that the pipe would
> ever do."  *[ECF No 89-1 at 47]*.

Thus, Jergenson unambiguously acknowledged that he sold the Trademark in

1987 without intent to resume using it.  As such, Jergenson assigned and abandoned

the Trademark in 1987.  Pursuant 15 U.S.C. §1127, a trademark shall be deemed to

be abandoned "[w]hen its **<u>use</u>** has been discontinued with **<u>intent</u>** not to resume such

use…"

Thus, it cannot be disputed that Jergenson abandoned and relinquished all

rights to the Trademark in 1987.

*(2)    Jergenson Did Not Regain Rights to the Trademark After 1987*

After selling the Trademark in 1987, Jergenson did not regain rights to the

Trademark under any law or contract.  Instead, Jergenson began using the

Trademark without authorization from the true owner, Mr. Michael Lightrain to whom Jergenson sold the Trademark in 1987. *[ECF No 89-1 at 55-56]*. In fact, when Jergenson wanted to return to the smoking pipe business in 2018, Jergenson and Mr. Lightrain were no longer in good terms so Jergenson started re-using the Trademark without Mr. Lightrain's consent. Jergenson testified to this as follows:

"Q: Did you ever have a falling out with Michael Lightrain?
A: Yes. Near the end, when he was shutting down and not able to fill orders, I had come up with a new pipe design, and I said, 'Let's be partners.' And he said, 'I would rather compete against you.'
Q: And what year was this?
A: That would have been about 2017, 2018, somewhere in there.
Q: Okay.
A: And he was losing it fast, but he --
Q: When you say losing it, what do you mean by losing it?
A: He was losing market share.· His employees had all left. And it was just him in this big building. He was trying to make pipes one at a time. And just couldn't keep up with it. And, again, he hadn't paid his rent for several years, and the landlord evicted him. So he packed up the manufacturing equipment and put it in storage. And I brought in the equipment that I had put together and was operating out of my living room. And I moved back into this big building.
…
Q: Did he sell the patent or the trademark back to you when you restarted the pipe business?
A: No.
Q: I think your earlier testimony was that he indicated to you that he would rather compete with you?
A: That was his initial -- that is what he had said, yeah." *[ECF No 89-1 at 60-62]*

"Q: What happened between 2015 and 2018?
A: I had a series of conversations with [Mr. Lightrain] and tried to convince him that I had a better Proto Pipe and that we should join forces. And he said he had a plan that didn't involve me. And, of course, he didn't have a plan. His only plan was just to go under. He lied to me." *[ECF No 89-1 at 66]*

"Q:  All right.  So did you say that Mr. Lightrain had claimed to you that he intended to go back into the pipe business and sell Proto Pipes again?
A:  He -- yeah, I would say he thought that he would, but everybody knew that he wouldn't.  He is a liar.
Q:  When was the last time he made this representation to you?
A:  Maybe when I saw him six months ago, but this is by a broken man who I knew -- he couldn't fight his way out of a wet paper bag.· He had no credibility anymore.  He had destroyed -- he had invested in so many companies.  Everything he touched went to hell.
…
Q:  Did you pay any money to Mr. Lightrain to be able to reuse the name Proto Pipe?
A:  No, I did not."  *[ECF No 89-1 at 68-70]*.

Therefore, Jergenson acknowledged that he began using the Trademark again without Mr. Lightrain's authorization when Mr. Lightrain's business fell in hard times,.  As discussed above, Jergenson sold his rights to the Trademark to Mr. Lightrain, thus, Mr. Lightrain, rather than Jergenson, had ownership interest in the Trademark.  After all, it is established that upon the valid sale of a trademark, the legitimate purchaser becomes transfixed to the position of his predecessor, enjoying the latter's rights in the mark dating from its initial use and suffering the burdens on and limitations of its use that were incumbent on his predecessor.  See *Donnell v. Herring-Hall-Marvin Safe Company,* 208 U.S. 267, 273 (1908).  See also *Herring-Hall-Marvin Safe Co. v. Hall's Safe Co.,* 208 U.S. 554, 557-58 (1908).  See also *Consumers Petrolium Co. v. Consumer's Co. of Illinois,* 169 F.2d 153, 156 (7th Cir. 1948).  See also *California Packing Corp. v. Sun-Maid Raisin Growers of California,* 81 F.2d 674, 676 (9th Cir. 1936).

Jergenson knew that Mr. Lightrain was the rightful owner of the Trademark so he requested authorization from Mr. Lightrain to use the Trademark repeatedly between 2015 and 2018.  When Mr. Lightrain denied the request, Jergenson elected to use the Trademark without authorization.  As such, Jergenson never legally regained rights to the Trademark after he sold it to Mr. Lightrain in 1987.  Nevertheless, the District Court unreasonably held:

> "After the new owner was unable to operate the business and ceased of manufacturing and selling the PROTO PIPE branded products, Jergenson started to manufacture and sell the PROTO PIPE branded products and proceeded with the trademark application under the guidance of his trademark counsel." *[ECF No 93 at 3-4].*

However, the evidence does not show that Mr. Lightrain permanently ceased his operation or, more important, his use of the Trademark.  Instead, Jergenson's deposition testimony shows that Mr. Lightrain fell into hard times with his business, but he represented to Jergenson that he intended to resume selling PROTO PIPES again.  *[ECF No 89-1 at 68-69].*  Thus, while it cannot be disputed that Mr. Lightrain owned rights to the Trademark since 1987, the evidence also shows that Mr. Lightrain did not abandon the Trademark.  After all, abandonment of a mark occurs only "when its use has been discontinued with intent not to resume such use."  See *15 U.S.C. §1127.*  In this case, Mr. Lightrain expressly indicated to Jergenson that he intended to resume selling products in connection with the Trademark.  Such representation was made by Mr. Lightrain to Jergenson

as soon as "six months" before Jergenson's deposition and after this lawsuit was filed. *[ECF No 89-1 at 68-69]*. As such, the evidence shows that Mr. Lightrain acquired rights to the Trademark from Jergenson in 1987 and continued to have rights to the Trademark until after this lawsuit was filed.

Essentially, the District Court was unreasonable in suggesting that the rights to the Trademark automatically reverted back to Jergenson as soon as Mr. Lightrain ceased operation of his business. While ceasing to operate his business may have caused Mr. Lightrain to cease using the Trademark, Mr. Lightrain did not have the required "intent not to resume such use" to make the Trademark abandoned. Nevertheless, assuming *arguendo*, that Mr. Lightrain did abandon the Trademark, then the Trademark still does not automatically revert back to Jergenson, especially since it was over 30 years since Jergenson had used the Trademark. Instead, assuming *arguendo*, that Mr. Lightrain did abandon the Trademark, then Jergenson had to first re-establish his rights to the Trademark, such rights do not automatically revert back to him. See *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1355 (E.D.N.Y. 1994) ("Hence a party that is found to have abandoned its mark is deprived of any claim to priority in the mark before the date of abandonment and may regain rights in the mark only through subsequent use after the time of abandonment.") (citing *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 627 F.2d 628, 630 (2d. Cir. 1980)).

But, Jergenson's own testimony acknowledges that Mr. Lightrain had not abandoned the Trademark pursuant 15 U.S.C. §1127. Thus, at all relevant times in this lawsuit, Jergenson did not have any rights to the Trademark. Accordingly, Jergenson's litigating position was exceptionally weak. Such makes this case exceptional.

## III.    JERGENSON COMMITTED  FRAUD ON THE USPTO

Filing a trademark application requires the applicant to submit to the USPTO a **verified** statement as to specific allegations. After all, 37 CFR §2.33 expressly requires as follows:

> "The [trademark] application must include a **verified** statement…[which] must allege…that the applicant believes the applicant is the owner of the mark; that the mark is in use in commerce; that to the best of the signatory's knowledge and belief, no other person has the right to use the mark in commerce…" See *37 CFR §2.33(a) and (b).*

In the present case, it is undisputable that Jergenson assigned his rights to the Trademark to Mr. Lightrain in 1987. In addition, it is acknowledged by Jergenson that between 2015 and 2018, he had "a series of conversations with [Mr. Lightrain]" trying to persuade him to allow Jergenson back in the PROTO PIPE business, but, Mr. Lightrain refused repeatedly. *[ECF No 89-1 at 66].* Nevertheless, Jergenson filed his trademark application for the Trademark on August 29, 2018. *[ECF No 89-1 at 5].* Most important, Jergenson filed his trademark application with an unambiguous representation to the USPTO that he had priority to the Trademark

26

dating back to 1976.  *[ECF No 89-1 at 5]*.  In fact, such representation was false since Jergenson had not used the Trademark since 1987, a period of over 30 years. But most important, in making such representation to the USPTO, Jergenson concealed that Mr. Lightrain had the right to use the PROTO PIPE mark in commerce based on Jergenson's 1987 assignment of the Trademark to Mr. Lightrain.  As discussed in detail below, such misrepresentations and other lies made by Jergenson constitute fraud on the USPTO.

First, 37 CFR §2.33 requires the applicant of a trademark application to verify that the mark is used in commerce.  See *37 CFR §2.33(a) and (b)*. However, Jergenson filed the trademark application identifying the Applicant as "Phillip Jergenson, DBA Mendo Mountain Manufacturing".  *[ECF No 89-1 at 5]*. In fact, Jergenson filed his trademark application pursuant to 15 U.S.C. §1051(a) for use of a trademark as opposed to 15 U.S.C. §1051(b) for bona fide intention to use a trademark.  By filing his trademark application pursuant to 15 U.S.C. §1051(a), he filed the required verified statement pursuant to 37 CFR §2.33 that the Applicant, Mendo Mountain Manufacturing, was using the Trademark in commerce.  Such verified statement was false because, in fact, Mendo Mountain Manufacturing, was not using and had never used the Trademark in commerce. Jergenson acknowledged this in deposition as follows:

> "Q:  Okay.  When did you establish Mendo Mountain Manufacturing?
> A:  In I think it would have been January of 2015.

Q:  And is Mendo Mountain Manufacturing still in existence?
A:  No.
Q:  What happened to Mendo Mountain Manufacturing?
A:  When I got the brand Proto Pipe back, I dissolved Mendo Mountain Manufacturing.  I had no use for it anymore.
…
Q:  Did you, Phillip Jergenson, doing business as Mendo Mountain Manufacturing, use the trademark Proto Pipe since July 12, 1976, to the present?
A:  Well, when I had Mendo Mountain, which was only about three years, I did not use the name Proto Pipe.  I used the name Mendo Pipe.
…
Q:  All right.  So let's step back.  Did you use -- let me ask it again.  Did you use the trademark Proto Pipe as yourself, Phillip Jergenson, doing business as Mendo Mountain  Manufacturing since 1976?
A:  No."  *[ECF No 89-1 at 85-88]*.

Thus, the Registration was issued based on Jergenson's false representation that his proprietorship "Mendo Mountain Manufacturing" was using the Trademark and had used the Trademark since 1976.  *[ECF No 89-1 at 5]*.  However, in deposition, Jergenson acknowledged that his proprietorship never used the Trademark at all.  In fact, Jergenson acknowledged that he set up Mendo Mountain Manufacturing in 2015 and dissolved it when he received the Registration in 2019.  More important, Jergenson acknowledged that Mendo Mountain Manufacturing used the "Mendo Pipe" mark instead of the "Proto Pipe" mark.  Thus, Jergenson's false representation that Mendo Mountain Manufacturing had used the mark since 1976 and was still using it, constitutes fraud on the USPTO, especially since such misrepresentation was made in a **_verified_** statement pursuant to 37 CFR §2.33.

Second, in his verified statement made pursuant to 37 CFR §2.33, Jergenson represented that he is the owner of the mark and had rights to the mark since his first use in 1976. Such representation was false because Jergenson assigned all rights to the Trademark to Mr. Lightrain in 1987. Pursuant to such assignment, the assignee, Mr. Lightrain, steps into the shoes of the assignor, Jergenson. See *Premier Dental Prods. Co. v. Darby Dental Supply Co.,* 794 F.2d 850, 853 (3d Cir. 1986). Even more, as a result of Jergenson's sale of the Trademark to Mr. Lightrain in 1987, Mr. Lightrain, succeeded to Jergenson's claimed 1976 first use of the Trademark. After all, it is established that upon the valid sale of a trademark, the legitimate purchaser becomes transfixed to the position of his predecessor, enjoying the latter's rights in the mark dating from its initial use and suffering the burdens on and limitations of its use that were incumbent on his predecessor. See *Donnell v. Herring-Hall-Marvin Safe Company,* 208 U.S. 267, 273 (1908). See also *Herring-Hall-Marvin Safe Co. v. Hall's Safe Co.,* 208 U.S. 554, 557-58 (1908). See also *Consumers Petrolium Co. v. Consumer's Co. of Illinois,* 169 F.2d 153, 156 (7th Cir. 1948). See also *California Packing Corp. v. Sun-Maid Raisin Growers of California,* 81 F.2d 674, 676 (9th Cir. 1936).

Therefore, with his sale of the Trademark to Mr. Lightrain in 1987, Jergenson surrendered his rights, including his date of first use, to Mr. Lightrain. Even more, since Jergenson ceased using the Trademark for over 30 years between

1987 and 2018, he abandoned the Trademark pursuant to 15 U.S.C. §1127. Such

abandonment defeats Jergenson's claim of priority. See *Dial-A-Mattress*

*Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1355 (E.D.N.Y.

1994) ("Hence a party that is found to have abandoned its mark is deprived of any

claim to priority in the mark before the date of abandonment and may regain rights

in the mark only through subsequent use after the time of abandonment.") (citing

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 627 F.2d 628, 630 (2d. Cir.

1980)). Thus, Jergenson's false representation constitutes fraud on the USPTO,

especially since such misrepresentation was made in a **<u>verified</u>** statement pursuant

to 37 CFR §2.33.

Third, in his verified statement made pursuant to 37 CFR §2.33, Jergenson

represented that "no other person has right to use the mark in commerce". See *37*

*CFR §2.33(a) and (b).* Such representation to the USPTO was false because Mr.

Lightrain had a right to use the mark in commerce in 2018, when Jergenson filed

his application. Mr. Lightrain's right to use the mark was pursuant to Jergenson's

sale of the Trademark in 1987. In fact, Jergenson acknowledged that, between

2015 and 2018, he unsuccessfully attempted to persuade Mr. Lightrain to allow

Jergenson to re-enter to Proto Pipe business. Mr. Lightrain refused and

unambiguously represented to Jergenson his intention to continue using the

Trademark. Therefore, Jergenson's representation to the USPTO that "no other

person has right to use the mark in commerce" was blatantly and audaciously false.

Even more, Jergenson's failure to disclose to the USPTO the rights that Mr.

Lightrain had to the mark evidences Jergenson's intent to conceal this material

fact. Such constitutes fraud on the USPTO, especially since such

misrepresentation was made in a **<u>verified</u>** statement pursuant to 37 CFR §2.33.

Since the evidence shows that Jergenson made verified statements to the

USPTO that were false, Jergenson committed fraud on the USPTO making this

case exceptional.

## IV. <u>THE DISTRICT COURT WAS UNREASONABLE IN RELYING ON THE PRESUMPTION AFFORDED BY THE REGISTRATION</u>

The District Court unreasonably relied on the presumption that Jergenson

owns the Trademark since the USPTO issued the Registration. After all, such

presumption is not absolute but rebuttable because "under the Lanham Act,

registration…shifts the burden of proof from the plaintiff, who would have to

establish his right to exclusive use in a common law infringement action, to the

defendant, who must introduce sufficient evidence to rebut the presumption of

plaintiff's right to such protected use. See *Vuitton et Fils S.A. v. J. Young Enters.,*

*Inc.,* 644 F.2d 769, 775 (9th Cir. 1981). Once the presumption of validity is

overcome, the mark's registration is merely evidence "of registration", nothing

more. See *Tie Tech, Inc. v. Kinedyne Corp.,* 296 F.3d 778, 783 (9th Cir. 2002).

In the present case, Jergenson filed a trademark application for the Trademark in 2018. *[ECF No 89-1 at 5]*. However, as discussed above, the evidence establishes that Jergenson filed his trademark application knowing that he did not have exclusive right to use the Trademark. Furthermore, in his trademark application, Jergenson falsely claimed priority of use to the Trademark dating back to 1976. *[ECF No 89-1 at 5]*. After all, in 1987, Jergenson assigned all his rights to the Trademark to Mr. Lightrain, including all rights to claim priority use dating back to 1976. See *Donnell v. Herring-Hall-Marvin Safe Company,* 208 U.S. 267, 273 (1908). See also *Herring-Hall-Marvin Safe Co. v. Hall's Safe Co.,* 208 U.S. 554, 557-58 (1908). See also *Consumers Petrolium Co. v. Consumer's Co. of Illinois,* 169 F.2d 153, 156 (7th Cir. 1948). See also *California Packing Corp. v. Sun-Maid Raisin Growers of California,* 81 F.2d 674, 676 (9th Cir. 1936).

Furthermore, in his trademark application, Jergenson falsely represented that Mendo Mountain Manufacturing was using the Trademark. But, in fact, Mendo Mountain Manufacturing never used the Trademark. Nevertheless, the District Court erroneously assessed the facts as follows:

> "After the new owner was unable to operate the business and ceased of manufacturing and selling PROTO PIPE branded products, Jergenson started to manufacture and sell the PROTO PIPE branded products and proceeded with the trademark application…" *[ECF No 93 at 3-4].*

However, the evidence does not show that Jergenson began using the Trademark before proceeding with his trademark application. Instead, the evidence shows that when Mr. Lightrain's business fell in hard times, Jergenson established Mendo Mountain Manufacturing which started using the "Mendo Pipe" mark rather than the "Proto Pipe" mark. Nevertheless, Jergenson falsely represented to the USPTO that he was using the Trademark. Jergenson did not start using the Trademark again until **<u>after</u>** the USPTO issued the Registration. Thus, the evidence contradicts the District Court's holding that Jergenson began using the Trademark before filing his trademark application. The District Court erroneously assessed the facts.

Thus, the evidence presented by Inhale is sufficient to overcome the presumption afforded by the Registration. Nevertheless, the District Court unreasonably held that Jergenson's attempt to enforce his rights pursuant to his Registration was not exceptional. On the contrary, Jergenson's attempt to enforce the Registration knowing that he did not have exclusive right to use the Trademark, knowing that he assigned his rights to the Trademark in 1987, and falsely representing that he was using the Trademark, makes Jergenson's attempt to enforce the Registration exceptional. Jergenson's main argument on this matter is that his rights to the Trademark derive from his use of the Trademark since 1976. However, as a matter of law, Jergenson's rights were extinguished when he

assigned them to Mr. Lightrain in 1987, a fact that is acknowledged by Jergenson and the District Court.

Accordingly, the District Court was unreasonable to rely on the presumption that the Trademark was owned by Jergenson based on the Registration. The overwhelming evidence rebuts Jergenson's claims of ownership to the Trademark. Without his claimed priority dating back to 1976, Jergenson's claim to the Trademark is extraordinarily weak making this case exceptional.

## V.    THE DISTRICT COURT WAS UNREASONABLE IN HOLDING THAT JERGENSON WAS NOT AWARE OF HOW SMALL DAMAGES WERE UNTIL AFTER DISCOVERY

Ultimately, after dragging Inhale through months of expensive litigation, Jergenson voluntarily dismissed his claim against Inhale because the expense of one deposition "alone outweigh[ed] any monetary remedy [Jergenson] could expect to receive should he prevail in this case." *[ECF No 83 at 2].* Thus, Jergenson dismissed his claim against Inhale when he first purportedly realized that Inhale did not sell infringing goods. Then the District Court unreasonably held as follows:

> "I agree with Jergenson. Inhale has presented no evidence that Jergenson was aware that his damages would be so low at the time of filing this litigation and in pursuing discovery." *[ECF No 93 at 6].*

The District Court's holding is unreasonable because it ignores the TRO it issued against Inhale at the very start of the case. *[ECF No 16].* In fact, the TRO

34

expressly and unambiguously ordered Alibaba to promptly provide Jergenson all records related to Inhale including records related to Inhale's listings, sales, and financial information. *[ECF No 16 at ¶4]*.

Jergenson's claim against Inhale was based entirely on the Alibaba Listing through which Inhale allegedly sold infringing product. *[ECF No 36-4 at 4] and [ECF No 78 at 4]*. Thus, Jergenson filed this lawsuit and immediately sought the TRO which was granted by the District Court and ordered Alibaba to turn over all of Inhale's records to Jergenson, including sales information. *[ECF No 16 at ¶4]*. More important, there is nothing on the record showing that Alibaba failed to comply with the District Court's order. As such, soon after Jergenson filed this lawsuit, he attained access to all of Inhale's records from Alibaba. Essentially, from the very start of the case, Jergenson knew exactly how many products Inhale sold through Alibaba. Despite having this information, Jergenson dragged Inhale through months of litigation only to dismiss the case under the assertion that he did not know the extent of Inhale's sales until after discovery. Such is unreasonable.

In fact, the sole purpose of a TRO is to preserve the status quo in a case and to prevent any records from being destroyed, lost, or altered. See *Benisek v. Lamone*, 138 S. Ct. 1942 (2018). See also *Louisiana-Pacific Corporation v. James Hardie Building Products, Inc.*, 928 F.3d 514 (6th Cir. 2019). See also *Federal Trade Commission v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346 (S.D. Fla.

2019).  See also *Brown v. Pacifica Foundation, Inc.*, 34 Cal. App. 5th 915 (1st

Dist. 2019).  See also *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610

(2019).  See also *Wechem, Inc. v. Evans*, 274 So. 3d 877 (La. Ct. App. 5th Cir.

2019).  See also *Keller v. Kay*, 96 N.Y.S.3d 605 (2d Dep't 2019).  Therefore, there

cannot reasonably be any doubt that Jergenson was fully aware of the extent of

Inhale's use of the Trademark and its sales related thereto from the very start of the

case soon after the TRO was issued and long before discovery began.

Despite attaining the TRO and attaining records from Alibaba, Jergenson

dragged Inhale through extensive discovery only to then dismiss his claims under

the guise that he did not know that damages from Inhale's alleged conduct was

miniscule.  Thus, dragging Inhale through extensive discovery can only be justified

if Jergenson received information from Alibaba through the TRO showing that

Inhale actually sold the infringing product.  That is not the case here.  Jergenson

attained records from Alibaba pursuant to the TRO and came up empty handed

with regards to Inhale's sales of the infringing product.  Then, Jergenson dragged

Inhale through extensive discovery and, once again, came up empty handed.  There

was no reasonable basis for Jergenson to believe that he would uncover evidence

of Inhale's purported infringement in discovery after he received records from

Alibaba pursuant to the TRO.

Accordingly, it was unreasonable for the District Court to hold that Jergenson acted properly in dragging Inhale through months of extensive litigation after attaining records pursuant to the TRO early in the case showing that damages were miniscule, if any.

## VI. THE TRAVESTY IN THIS CASE IS THAT 240 OTHER DEFENDANTS HAVE A JUDGMENT ENTERED AGAINST THEM OR HAVE SUCCUMB TO JERGENSON'S UNREASONABLE SETTLEMENT DEMANDS

The true travesty in this case is that Inhale was the only defendant out of the 241 defendants in this case that stoop up to Jergenson and showed that Jergenson's claim was exceptionally weak. After all, the evidence, as discussed above, raises serious questions about Jergenson's rights to the Trademark. Essentially, the other 240 defendants have had a judgment entered against them or have succumb to Jergenson's unreasonable settlement demands. In other words, Jergenson sold the Trademark in 1987 for a substantial amount of money and now has collected even more money from numerous defendants based on his unmeritorious claim that he has rights to the Trademark. Inhale spent a substantial amount of money standing up to Jergenson and revealing the extraordinary weakness of Jergenson's claim. Then, Jergenson astutely dismissed his claim against Inhale to avoid judgment day. But now, the District Court unreasonably held that this case is not exceptional. Such is the true travesty of this case. After all, if this case is not exceptional, then what case is?

## CONCLUSION

Based on the foregoing, Defendant/Appellant respectfully requests this

Court to reverse the District Court's Final Judgment and remand this case to the

District Court for further proceedings limited to an award of attorney's fees.

DATED:  April 26, 2024

Respectfully submitted,

Louis F. Teran
SLC LAW GROUP
1055 E. Colorado Blvd., Suite 500
Pasadena, CA 91106
Telephone: (818) 484-3217 x200
Facsimile: (866) 665-8877
Email:  Lteran@SLCLG.com

*Counsel for Appellant-Defendant*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Appellant-Defendant Inhale International Limited, furnishes the following in compliance with F.R.A.P Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is 7,425 words.

DATED: April 26, 2024

Respectfully submitted,

Louis F. Teran
SLC LAW GROUP
1055 E. Colorado Blvd., Suite 500
Pasadena, CA 91106
Telephone: (818) 484-3217 x200
Facsimile: (866) 665-8877
Email: Lteran@SLCLG.com

*Counsel for Appellant-Defendant*

## **PROOF OF SERVICE**

The undersigned, counsel for the Appellant-Defendant Inhale International Limited, hereby certifies that on April 26, 2024, two copies of the Brief and Required Short Appendix of Appellant and one copy of the Separate Appendix as well as a digital version containing the brief, were delivered by email and USPS to counsel for the Appellee-Plaintiff Phillip Jergenson.


DATED:  April 26, 2024

> Respectfully submitted,
>
>
> _____
> Louis F. Teran
> SLC LAW GROUP
> 1055 E. Colorado Blvd., Suite 500
> Pasadena, CA 91106
> Telephone: (818) 484-3217 x200
> Facsimile: (866) 665-8877
> Email:  Lteran@SLCLG.com
>
> *Counsel for Appellant-Defendant*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

DATED: April 26, 2024

Respectfully submitted,

Louis F. Teran
SLC LAW GROUP
1055 E. Colorado Blvd., Suite 500
Pasadena, CA 91106
Telephone: (818) 484-3217 x200
Facsimile: (866) 665-8877
Email: Lteran@SLCLG.com

*Counsel for Appellant-Defendant*

# **APPENDIX**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PHILLIP JERGENSON,

        Plaintiff,

        v.

INHALE INTERNATIONAL LIMITED,

        Defendant.

No. 22 CV 2040

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

In April 2022, plaintiff Phillip Jergenson brought this case against 241 defendants including Defendant Inhale International Limited alleging mass counterfeiting of a federally registered trademark, PROTO PIPE. [1].[1] A year into litigation, Jergenson voluntarily dismissed the case against Inhale. [83]. Inhale now seeks attorney's fees pursuant to 15 U.S.C. § 1117(a). [89].

## I.    Background

Beginning in 1971, Jergenson sold smoking pipes through Proto Pipe LLC, a California limited liability company. [10] ¶¶ 5–6; [34-3] at 2–4. In 1987, Jergenson sold his pipe-making business. [89-1] at 47. Jergenson assumed control of the proto pipe brand for a second time in 2018. [89-1] at 61–66; [25] at 17. Jergenson applied for trademark registration for the words PROTO PIPE and for a "PP" logo in August

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

2018 and April 2019. [34-1] at 2; [34-2]. The registrations were approved in 2019. *See* [10-2].

Allegedly, Inhale used Jergenson's marks to advertise and sell counterfeit items, causing confusion in the market despite knowing that Jergenson owned the trademarks. [10] ¶¶ 17–21, 23. I granted Jergenson's motion for preliminary injunction against Inhale, enjoining it from using Jergenson's trademarks. [65]. I also granted Jergenson's motion to dismiss Inhale's counterclaims. *Id.*

In March 2023, Jergenson brought a motion to compel discovery responses. [78]. Two days after I denied his motion to compel, [82], Jergenson voluntarily dismissed the case against Inhale because the costs of discovery outweighed potential recovery in the case, [83]. Inhale filed this motion for attorney's fees pursuant to 15 U.S.C. § 1117(a), arguing that this case falls under the "exceptional" case standard warranting attorney's fees. [89].

## II.    Analysis

### A.    Legal Standard

The Lanham Act permits an award of attorney's fees to the prevailing party in "exceptional cases." 15 U.S.C. §1117(a). When analyzing whether a case is "exceptional" for purposes of awarding attorneys' fees under the Lanham Act, courts consider the substantive strength of a party's litigation position and whether the way the case was litigated was unreasonable. *LHO Chicago River, L.L.C. v. Rosemoor Suites, LLC*, 988 F.3d 962, 967 (7th Cir. 2021) (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

2

While "there is no precise rule or formula" to determine if a case is exceptional, courts can "consider a 'nonexclusive' list of 'factors,' including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Octane Fitness*, 572 U.S. at 554 & n. 6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 & n.19 (1994)). The party requesting fees bears the burden of proving by a preponderance of the evidence that the case is "exceptional" sufficient to warrant an award of attorney's fees. *See id.* at 557–58.

## B.   Strength of Jergenson's Litigating Position

Inhale argues Jergenson's case was exceptionally weak and objectively unreasonable for three reasons. First, Inhale argues that Jergenson has not produced any evidence that Inhale used the trademark within the United States in violation of the Lanham Act. [89] at 6–7. Inhale argues that Jergenson relied only a product listing published on Alibaba that customers were not actually able to use to complete a purchase. *Id.* at 5–6 (citing [36-4] at 4; [78] at 4). While customers may have not been able to purchase Inhale's product through its listing, Inhales has not provided any evidence that Jergenson did not have a good faith belief that Inhale was offering for sale and selling smoking pipes that infringed on his registered trademark at the time he brought this case.

Second, Inhale argues that Jergenson abandoned his trademark in 1987. *Id.* at 7. In deposition, Jergenson acknowledged that he sold all rights to the trademark in 1987 without any intent to use it again in the future. [89-1] at 58–59. After the new owner was unable to operate the business and ceased of manufacturing and selling

3

the PROTO PIPE branded products, Jergenson started to manufacture and sell the PROTO PIPE branded products and proceeded with the trademark application under the guidance of his trademark counsel. [91] at 9 (citing [89-1] at 64–66). Jergenson argues that when he filed the lawsuit, he owned the PROTO PIPE trademark, which is considered presumptively valid as it is registered with the United States Patent and Trademark Office. *Id.* at 8. While the parties dispute the validity of Jergenson's trademark, that does not make Jergenson's attempt to enforce his trademark rights exceptional.

Third, Inhale argues that Jergenson's registration is invalid due to fraud on the United States Patent and Trademark Office. [89] at 10–11. Inhale argues that Jergenson falsely represented that his proprietorship used the trademark since 1976, and that the product can be used with a variety of herbs. *Id.* Jergenson argues that this accusation is meritless because Inhale failed to prove that Jergenson knowingly made inaccurate or misleading statements. [91] at 8–9 (citing *Illyrian Imp., Inc. v. ADOL Sh.p.k.*, 2022 USPQ2d 292, *39 (TTAB 2022) ("Fraud in procuring … a trademark registration occurs when an applicant … knowingly makes specific false, material representations of fact with the intent of obtaining or maintaining a registration to which it is otherwise not entitled.")).

While Inhale has cited to at least one case that found a "plaintiff's Lanham Act claims were objectively unreasonable, motivated by a competitive play to seize partnership property, and led to self-help actions that are the kind of tactics that courts should deter," based on the record here, I do not find that there was fraud or

4

an improper taking of the trademark as Inhale encourages. *See* [92] at 4 (quoting *VIDIVIXI, LLC. V. Grattan*, 2016 WL 436792, at *4 (S.D.N.Y. 2016)). "Fraud must be shown by clear and convincing evidence in order to provide a basis for either cancellation or damages," and it may be found to exist "only where there is a deliberate attempt to mislead the Patent Office into registering the mark." *Money Store v. Harriscorp Fin.*, Inc., 689 F.2d 666, 670 (7th Cir. 1982) (citations omitted). I previously held that Inhale's accusations of fraud were not enough to state a claim. [65] at 15–16. Inhale has presented no additional evidence of fraud on this motion that shows this case is exceptional.

### C. Jergenson's Litigation Conduct

Inhale also argues that this case is exceptional because of the unreasonable way the case was litigated. [89] at 12. Here, I consider factors such as Jergenson's "motivation" and "the need in particular circumstances to advance considerations of compensation and deterrence." *LHO Chicago River*, 988 F.3d at 969 (quoting *LHO Chicago River v. Perillo*, 942 F.3d 384, 386 (7th Cir. 2019)).

Inhale argues that Jergenson unreasonably pursued this case even though Jergenson knew that the case could only result in low damages. [89] at 12. Jergenson's voluntary dismissal stated that the expense of one deposition, over $10,000, "alone outweigh[ed] any monetary remedy Plaintiff could expect to receive should he prevail in this case." [83] at 2. Inhale argues that Jergenson knew about this early in the case when Jergenson attained records related to Inhale's sales and offers for sale through Alibaba. [89] at 13 (citing [16] ¶ 4). Inhale also argues that Jergenson litigated this case to gain access to Inhale's information, including

5

customer lists, for its sales outside of the United States. *Id.* at 14. When Inhale refused to provide such information, Jergenson moved to compel, which was denied. [82] at 1.

Jergenson argues that he cooperated fully in discovery and prosecuted this case according to the rules. [91] at 11. Jergenson asserts that he had no knowledge of the number of sales at the outset of this matter, or at any time thereafter. *Id.* Jergenson argues that, at the time of filing following an extensive investigation, he had a reasonable basis to conclude that Inhale was offering goods for sale to U.S. purchasers bearing a counterfeit PROTO PIPE mark. *Id.* (citing [91-1] ¶ 7). Because the Lanham Act provides a cause of action against persons offering infringing and counterfeit goods, regardless of any sales, Jergenson asserts he had a good faith basis to involve Inhale in this case and to pursue discovery to verify the contentions in its written responses. *Id.*

I agree with Jergenson. Inhale has presented no evidence that Jergenson was aware that his damages would be so low at the time of filing this litigation and in pursuing discovery. Jergenson has presented evidence that he had a good faith basis to involve Inhale in this case and to pursue discovery. *See* [91-1] ¶ 7. Further, Jergenson quickly dismissed the case after his motion to compel was denied. [83]. Jergenson's litigation conduct is not so exceptional to warrant attorney's fees.

III. **Conclusion**

Defendant's motion for attorney's fees, [89], is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: December 27, 2023

7